From phoenixnewtimes.com
Originally published by *Phoenix New Times* Feb 02, 1994
©2005 New Times, Inc. All rights reserved.



# DEBT IN THE WATER"ZERO-DOWN " BANKRUPTCY FIRMS COST THEIR CLIENTS PLENTY

## BY PAUL RUBIN

The television commercial sounded like a godsend to Ruthie Dennis.
Pay nothing down! an authoritative male voice intoned. Get your
financial fresh start today!

A fresh start is what Dennis needed. Income-tax and other debts had haunted her since she'd retired from Honeywell in 1991 after 20 years on the job.

Dennis had moved from her own house into an apartment and made other efforts to cut expenses. But that had failed to stem the tide.

"The bills were piling up and things were getting away from me," says the 58-year-old widow. "I seen myself going down the drain, and I didn't want it to happen. I wanted to do what I could."
The TV ad led the north Phoenix resident last summer to the Phoenix offices of Duane Varbel and Associates, the first Arizona law firm to pitch what's known as "zero-down" bankruptcy filings.

Zero-down refers to a previously rare practice: attorneys demanding nothing up front (except for filing fees) from clients in Chapter 7 bankruptcy cases.

Dennis recalls that she met for about 15 minutes with Varbel, who gave his well-practiced spiel about the advantages of wiping one's financial slate clean with a Chapter 7 bankruptcy. Varbel then introduced her to an assistant.

In a span of about 90 minutes, the assistant--not a lawyer--asked questions and took notes about Dennis' financial condition. The assistant also asked for $150 to cover the bankruptcy filing cost.

Near the end of the session, Dennis says, the assistant pulled out a chart that purported to show what she could afford in legal fees. It came to $187.50 a month for eight months, or about $1,500.

The assistant then presented Dennis with an unsecured promissory note to seal the deal. It indicated she would pay off her attorney's fees through a finance company, starting a few weeks later. The document warned her "to keep the contract current for a truly FRESH START with your credit."

Like most people, Ruthie Dennis didn't comparison-shop or ask around about her new attorney. She just wanted someone to direct her back to financial stability.

"I thought they knew what they were doing," Dennis says. "I mean, it's not cheap to advertise on TV, is it?"

EXHIBIT A-1

Duane Varbel's firm--now known as Hessinger and Associates--is one of two Valley zero-down firms that have taken the local bankruptcy system by storm in the last year or so. Thanks to nonstop, multimedia advertising campaigns, the firms grabbed about one in every six Chapter 7 debtors who hired an attorney last year.

The boom in zero-down bankruptcy in Arizona can be traced to two brothers, Larry Majors Sr. and Wayne Majors. Both men have been convicted of white-collar crimes in recent years, and have served time behind bars. Like pied pipers, the Majors brothers have led lawyers in three states into the lucrative bankruptcy business--and often controversy and ruin. @rule:

@body:Bankruptcy-related services had been one of the Valley's steadiest growth industries since the economic free fall of the late 1980s. Filings in Arizona quintupled during a ten-year period that ended in 1992, and the stigma that once accompanied such declarations has vanished.

But last year marked the first decrease in Arizona bankruptcy filings since 1990, which makes the burgeoning of zero-down business even more impressive. More than 2,500 Arizonans in 1993 signed on with attorneys from the two zero-down firms, Hessinger and Associates and Michael S. Manning and Associates. Mike Manning hung up a zero-down shingle only last August, yet already has forged a spot as one of the area's busiest Chapter 7 operators. (Michael S. Manning is not the Michael C. Manning of Morrison and Hecker.)

These firms are run like fast-food restaurants: Speed and volume are their modus operandi. Ex-Varbel/Hessinger attorney Kathleen Patterson filed a staggering 877 bankruptcy cases in 1993 before she resigned last October.

And the zero-down firms are expanding like some fast-food franchises: Hessinger and Associates now has seven offices in California and two in Arizona. Manning and Associates has two offices in the Valley.

"The number of zero-down cases is frankly incredible," says Phoenix bankruptcy trustee Charles Riley. "It's a tribute to advertising, I guess. But the problems. . . . So often, I have to question the accuracy and honesty of the bankruptcy schedules and other things."
New Times conducted a months-long investigation of the Valley's two prominent zero-down firms, studying 300 Chapter 7 cases and speaking with 28 debtors who hired attorneys from the high-volume firms to represent them. The paper interviewed 40 people in five states, including bankruptcy attorneys, judges, trustees, debtors and other sources.

(No one from Hessinger and Associates responded to calls or a hand-delivered letter from New Times. Michael Manning's lawyer, Mike Scott, provided a written response from Manning, defending his firm's practices.)

There's nothing inherently evil about the zero-down concept. It's the manner in which the Valley zero-down firms are doing business that is causing grief for many of the very clients who go to them for help.

Zero-down lawyers on average soak their clients for about twice as much as attorneys who demand most or all of their fees before filing. That's about five times as much as document-preparation firms charge.

They have been allowed to do so even though the Arizona Supreme Court defines a "reasonable" fee, in part, as one "customarily charge[d] in the locality for similar legal services." The zero-down firms demand an average $1,400 per case, while the rest of the bankruptcy bar charges about $750.

The zero-down firms collect their excessive fees in a variety of smarmy ways. Manning and Associates has its clients postdate several months of checks to pay off legal fees, a practice that is a subject of great debate in bankruptcy courts around the nation. (State Bar ethics chairman Chris Skelly, a Maricopa County Superior Court judge, says the bar here has not yet considered the issue.)

Of more dubious legality is how Hessinger and Associates collects its copious attorney's fees. As the Ruthie Dennis case shows, Hessinger and Associates requires clients to sign promissory notes before filing for bankruptcy.

The law firm routinely turns the notes over to finance companies, mostly based in Utah and Nevada. Then the collection agencies play hardball with the supposedly emancipated debtors, charging 18 percent annual interest on the note and warning debtors in bluntly worded letters about ruining their Chapter 7 "fresh starts" if they don't pay up on time.

Hessinger attorneys never reveal this arrangement in Bankruptcy Court documents. To the contrary, they avow that they will not be sharing their attorney's fees with anyone outside the firm.

Glendale debtors Rodger and Lori Voglio say they were fast-talked last October by then-Hessinger and Associates attorney James P. Hernandez about the monthly payments.

Strapped with medical bills and child-support payments, and both being temporarily out of work, the Voglios signed up with Hessinger after hearing the firm's zero-down pitch. Hernandez, they say, told them they could afford $110 per month in attorney's fees.

But even before the couple's first payment came due, they realized Hernandez had miscalculated terribly. They contacted Provo, Utah, debt collector Tom Bailey to see if they could correct things.

They say they asked Bailey--who tells New Times he recalls the conversation--if they could pay him less than the $110 per month specified on the contract. Bailey said he couldn't do that, but the law firm might agree to review the deal.

What no one explained to the Voglios--or to any of the other debtors contacted by New Times--is that the collection of all their bills is automatically put on hold when they filed for Chapter 7 protection. Such debts routinely are later discharged by a judge.

"The finance-company arrangement defeats the purpose of a legitimate bankruptcy," says bankruptcy trustee Richard Brooks. "You're supposed to get a whole new life the day you file. Instead, you're back into debt before you even file."
Zero-down attorneys spend only minutes with their new clients before hurrying them along to an assistant. A lawyer may not see or talk to them again until the meeting with creditors and a bankruptcy trustee--if then.

"We sucked people in with our ads and told them we could solve everything," says a former legal assistant at Manning and Associates, who requested anonymity because he's job-hunting. "A lot of the people who come in are dirt-poor and have little education. They are going to declare bankruptcy,

whether they really need to or not."
But at least a few bankruptcy trustees and judges in Texas and California have declared war on certain zero-down tactics.

In a January 1993 ruling that floored the Texas bankruptcy system, Judge Leif Clark ordered that the fledgling San Antonio law firm of Davis and Associates be permanently barred from practicing bankruptcy in his sprawling district that includes Austin, San Antonio, Midland and El Paso.

"When the interests of an innocent and unsuspecting public are also at stake," Judge Clark wrote, "drastic and firm intervention is essential, especially when it appears that they are being victimized by what borders on a criminal enterprise."
The judge cited unqualified lawyers, misleading advertising and other wrongdoing, specifically targeting a former Arizona resident named Larry Majors Sr., the administrator and principal architect of the Davis firm. Larry Majors had followed in the footsteps of his brother Wayne, who led a Dallas zero-down firm from rags to riches to ruin.

Larry and Wayne Majors are hustlers who stepped out of their prison cells and into a gold mine in recent years. They are the masterminds behind the zero-down firms in Phoenix.

Although Larry Majors' current role at Hessinger and Associates is uncertain, his continued connection with Duane Varbel--still a force at the firm that used to bear his name--is not. Larry Majors long has been associated with Varbel, as a business confederate and client in criminal, civil and Chapter 7 bankruptcy matters. Until a few weeks ago, Majors and Varbel were prime players in the flourishing San Diego zero-down firm of Gordon and Associates.

Current and former employees at Manning and Associates say matter-of-factly that Wayne Majors, not Michael S. Manning, does the hiring and firing at the firm.

But Manning says in his letter to New Times, "Mr. Majors is not employed by Manning and Associates as an employee. Mr. Majors is a self-employed consultant that I have hired in the past, however, is not currently retained by me at this time . . . I am not interested in an alleged criminal record of Wayne Majors . . . Wayne Majors dealt with me honestly and fairly."

Since 1991, the Majors brothers have worked zero-down schemes in Texas, California and Arizona, moving from lawyer to lawyer like hucksters in a traveling medicine show. In that time, they have left in their wake overcharged and underrepresented debtors, as well as several disgraced attorneys.

Many of the local zero-down practitioners have had checkered legal careers at best, including disbarments (Varbel) and suspensions (Manning) by the State Bar of Arizona. Several of the lawyers have filed personal bankruptcies of their own in recent years.

Little has been done in Arizona about the abuses in the flourishing zero-down industry. The Arizona district of the federal Bankruptcy Court imposes few restrictions on what attorneys may charge debtor-clients. Judges consider only contested bankruptcy cases--the exception--and pay scant attention to fees and filing errors. And bankruptcy trustees generally consider a debtor's pre-petition finances, not payments made to attorneys after filings.

The Phoenix-based U.S. Trustee's office, which Congress created in the 1980s to monitor the Bankruptcy Court, has done little of substance to stop the well-documented abuses.

"We're very aware there is a serious snowballing problem out there," says United States Trustee Adrianne Kaylena, "and we're going to make our best effort in that area. But we truly don't have the resources to do as much as we would have liked."
@rule:
@body:No judge in Arizona has yet issued a ruling concerning zero-down firms. But the open window from which zero-down attorneys currently operate may be slamming shut in the near future, thanks to the test case of Ruthie Dennis.

If U.S. Bankruptcy Judge Redfield Baum rules in favor of Dennis, the Valley's zero-down firms may be compelled to make drastic changes in the way they operate. (Judge Baum declined to discuss the case publicly until after he rules.)

Michael Lane, a Phoenix attorney for trustee Richard Brooks, asked Baum to rule that Dennis' $1,500 legal fee--about average for zero-down firms--is excessive and uncollectible. Lane has argued that Hessinger and Associates doesn't reveal its financial arrangement in documents the firm files with bankruptcy trustees and judges.

The reason for the zero-down firms' lack of candor comes down to dollars and cents: A conscientious judge such as Redfield Baum might look askance at the financial arrangement between client, attorney and finance company.

"I question how many other debtors have suffered the fate of Mrs. Dennis," Lane argued in written papers filed with Baum.

Bankruptcy trustee Richard Brooks raised the ante last fall after he discovered Dennis' Chapter 7 filing papers were inaccurate as well as incomplete. Her petition, filed last July shortly before Duane Varbel allegedly sold his law firm to Pinetop attorney Joe Hessinger, showed three times her actual debt, among other serious mistakes.

Dennis insists she signed her petition without noticing it had neglected to list her promissory debt or the finance agency's intention to collect on it. Brooks, a streetwise Phoenix native who has questioned thousands of debtors as a trustee, says he believes Dennis.

"Ruthie Dennis didn't make a conscious decision to mislead me," Brooks explains. "I could have denied her bankruptcy discharge because her paperwork wasn't accurate or complete. But we're seeing so many cases like hers, these zero-down cases. I couldn't punish her for who she chose as her attorney."
@rule:
@body:The members of the Bankruptcy Trustees Association of Arizona have gathered on a chilly, late January evening at the Hungry Hunter on East Camelback. The trustees have been looking forward to this meeting.

Present to discuss zero-down bankruptcy are attorneys Michael S. Manning and Hugh Hull, of Manning's zero-down firm. What they have to say is of great interest to the 20 or so trustees attending.

The task of a trustee is to determine if a petition has been filed in good faith and to administer a bankrupt estate until a case is completed, usually several months after a filing. Some trustees are attorneys, but that's not a job requirement.

Even when things go smoothly, bankruptcy administration can be a daunting task. The troubles many trustees say they've been having with the zero-down firms--especially the poorly drafted petitions--have made their jobs even more taxing.

Manning and Hull wait at the end of a long dinner table, not knowing what to expect. It doesn't take long for them to find out.

"Mike, do you own your own firm?" starts Richard Brooks, the trustee largely responsible for pushing the momentous Ruthie Dennis case into Judge Baum's domain.

Manning, a moon-faced man in his mid-40s, shrugs at the question.
"It's my name on the door," he says in a monotone, not bringing up the name of the firm's czar, ex-convict Wayne Majors.

"How did you come up with the idea?"
"Talking with a lot of people."
There is a mountain of subtext here.

Phoenix attorney Maria Brewer says it was Wayne Majors, not Michael Manning, who hired her last August when Manning and Associates opened for business. She says she never even met Manning until she complained to him about inaccurate information the firm's "attorney's assistants" were giving to potential clients.

One of the assistants was Wayne Majors' relative Rick, identified as one of the "satisfied customers" on the firm's television ads. Rick Majors should be satisfied: His own Chapter 7 bankruptcy, filed last October 25, indicates Manning attorney Hugh Hull charged him nothing.

Manning tells the gathering of trustees that he's been "doing bankruptcies off and on for 11 years or so." The "off," he doesn't say, was when he abandoned his law practice in 1991 and the State Bar of Arizona suspended him.

Manning's career parallels that of other attorneys recruited by one or both of the Majors brothers: Financially distressed himself and eminently pliable, he is a typical "front man" for the zero-down gang.

While Manning's recent rise from financial ashes has been considerable, it doesn't quite qualify as the "fresh start" he promises his bankrupt clients. The bar's Disciplinary Commission voted December 11 to recommend Manning's public censure. The board agreed unanimously that Manning demonstrated "an inexcusable pattern of neglect and abuse" in several cases that predate his zero-down connection.

In April 1991, the bar suspended Manning. Around the time the bar reinstated him last summer, Manning explained his plans in writing:

"With the help of some friends, I now have been able to . . . open an office. I am in a position to get started again and wiser for the experience."
Manning didn't volunteer the name of his patron, Wayne Majors. Numerous sources say it's likely that, without Majors, Mike Manning might still be living in the spare bedroom of a friend's house, as he told the State Bar he'd been forced to do when his law practice collapsed a few years ago.

But Manning isn't out of the woods yet. On January 25, Manning appeared before a hearing officer at the State Bar of Arizona to answer six new complaints related to his pre-zero-down days. The State Bar is alleging that Manning filed bankruptcy cases while he was suspended, held himself out "to be a lawyer in good standing" when he wasn't, and did an inept job to boot.

Hugh Hull is far more polished than his "boss," Manning. A certified bankruptcy specialist with a decent r,sum,, he presents an unusually solid background for a Majors brothers employee.

Many in the area's Bankruptcy Court system speak well of Hull and profess not to understand why he joined a firm with the blemished Manning as its titular head.

Trustee Brooks asks Hull why Manning and Associates doesn't ask its clients to sign a bankruptcy "reaffirmation" agreement. The agreement spells out the exact nature of a debt and how it's supposedly going to be repaid. Debtors often sign such documents with their creditors in an effort to retain valuable property, usually a house or a car.

"We sign fee agreements, and sometimes we accept postdated checks," Hull responds, not answering Brooks' question.

"Postdated checks? How can you do that, Hugh?"
"Well, we'll be out the dollars if the debtor refuses to pay, and there's nothing we can do about it. We don't turn over our debtors to a collection agency. And we put in more hands-on time with our clients than other firms."
Hull's last remark brings a pointed response from trustee Lothar Goernitz.
"Many times, I see attorneys acquainting themselves with petitioners for the first time at the [creditor] meetings," Goernitz says. "I'm not picking on you guys, but it often comes from your firm and from Hessinger. I'm concerned about what is being done to earn these high fees. And the improperly filled-out forms flabbergast me.

"I get bombarded with calls and inquiries from debtors who ask, 'What do I do? I need advice.' I ask them if they're being represented by an attorney. They say they don't even know their damned attorney's name."
Hull dances around more questions as Michael Manning stares straight ahead. Dinner finally arrives, and the zero-down guys gladly plow into their grub. Thanking the trustees for the opportunity to visit, the pair leaves soon after eating.

@rule:
@body:Toting an armful of files, the young attorney steps into the lobby at the Firstar Metropolitan Bank and Trust building in downtown Phoenix.

"Anyone for Hessinger?" he asks a group of about ten people awaiting their scheduled session with a bankruptcy trustee.

Like kids in a classroom, six people shoot up their hands. All of them are slated for a 2 p.m. meeting before trustee Roger Brown and whatever creditors have shown up. All have hired Hessinger and Associates at an average fee of $1,280.

Trouble is, this is the first time they've ever seen or spoken to the friendly young man who says he's their lawyer. Murray Zeigler, the attorney they have met at the firm, however briefly, is nowhere in

sight.

"Hi, I'm John Bruno," the attorney says cheerfully. "Just follow along and I'll have you out of there in a jiffy."
The debtors file into the trustee's hearing room and join several others in the same Chapter 7 boat. It's hard to miss seeing a big sign that reminds debtors of the severe penalties for being dishonest.

The hearings are usually short, less than five minutes per debtor. But they are crucial to the bankruptcy process, the prime opportunity for a trustee to ask financial questions of a debtor under oath.

The hearings also allow creditors to grill debtors about a given debt. Few creditors actually attend these meetings. Today, only one--a woman representing a Phoenix jewelry store--has shown up.

Trustees schedule about ten Chapter 7 cases for each half-hour session, in alphabetical order by attorney. The sessions conclude with many debtors representing themselves, usually after a document-preparation service has filled out the paperwork.

On this day, trustee Brown hears exactly 100 cases. Thirty-eight debtors appear by themselves. Of the remaining 62, 14 are clients of Hessinger and Associates, ten are from Manning and Associates.

Attorney Bruno sidles up to each person who steps into the room after a half-hour's group of cases starts. "You looking for Hessinger? You looking for Hessinger?" is his mantra.

It goes well in some zero-down cases. But trustee Brown has problems with several others. He calmly asks one couple if they reviewed their bankruptcy petition before their attorney filed it. Sure did, they nod in unison.

"Are you working and making some money, ma'am?" the trustee asks the wife. "It says here you are working as a data processing clerk. Are you?"
"Yes, I am," she says.
Brown stares at attorney Bruno, who is flipping through a file.
"It indicates here she has no income at all. We have a problem here you'll have to resolve."
Bruno nods soberly and jots something in a notebook. He can't do much to help because he clearly is not familiar with these clients or their files. The couple signed a $1,500 contract with Hessinger and Associates last November.

Such error-laden zero-down cases are typical, say trustees and attorneys familiar with the drill.

"You'll see more 'nones' written down in zero-down petitions than you'd see at a convent," says Phoenix bankruptcy attorney Mike Lane.

Trustee Richard Brooks adds in a separate interview, "How do those lawyers have the gall to even show up? They know zip about their debtor at a time when a person certainly needs specific legal advice."

@rule:
@body:In his dealings with zero-down meister Larry Majors, Duane Varbel has been more than just a figurehead.

Everyone in the bar--the State Bar, that is--seems to have an opinion about the 61-year-old Varbel. Some have nice things to say about him personally, but usually only after shaking their heads about his mercurial career.

The quick version goes like this: a federal criminal conviction following a Cayman Islands money-laundering scheme, his subsequent disbarment, an appellate reversal of the conviction, his reinstatement to the practice of law, his own Chapter 7 declaration of bankruptcy, his incorporation of a zero-down firm and, finally, his probable disbarment for wrongdoing involving a client before he got into the zero-down scheme.

No one's saying how Varbel was able to afford the mammoth advertising campaign that kicked off the new firm a year after his own bankruptcy in April 1991, but it had the Majors brothers' fingerprints all over it.

Within months of its incorporation in May 1992, the Varbel firm had made a dent in the lucrative Phoenix bankruptcy market. Its staff was growing steadily, though the suffocating workload meant a rapid turnover. Varbel and Associates also opened at least a few offices in Southern California and one in Tucson.

But trouble seems to be Duane Varbel's constant companion. Last year, the State Bar of Arizona started the process of what it hopes is Varbel's second disbarment. The disciplinary matter concerns his legal work in a late-1980s landlord-tenant case in Payson.

Facing the prospect of disbarment, Varbel last summer either sold or transferred his practice to Pinetop lawyer Joe Hessinger. Hessinger did not return telephone calls from New Times, but sources at the firm say little has changed. Although Varbel likes to tell people he's on the verge of retirement, he shows up for work when he's in town and Hessinger spends most of his time in Pinetop.

Central to understanding how Varbel found zero-down is to know of his enduring relationship with Larry Austin Majors Sr. (Varbel didn't return telephone calls for comment. New Times was unable to contact Larry Majors.)

Maricopa County court records reveal Varbel represented Larry Majors in about a dozen civil lawsuits. Most of them accused Majors of stiffing creditors in failed business schemes in the 1980s.

Varbel also defended Majors after Majors' 1990 arrest on 16 felony counts of pocketing automobile sales taxes illegally charged to Indians while he was the general manager of a Payson dealership.

Majors was sentenced in 1991 to a year in jail and seven years' probation--the Gila County attorney requested a much-stiffer sentence--after Majors plea-bargained. He moved to Texas after his release and joined his brother.

Wayne Majors had had problems of his own. He served about 18 months in a federal prison in the late 1980s after his conviction for mail fraud. Court records show Wayne Majors originally faced the charges in 1979, but absconded to Mexico. In 1987, however, he was captured in Texas.

No one seems to know if the Majors brothers were the first to combine the concept of zero-down attorney's fees in bankruptcy cases with mass-media blitzkriegs. What's certain is that the idea came to pass soon after Wayne Majors recruited Dallas/Fort Worth attorney Charles Paternostro.

Like Michael Manning in Phoenix, Paternostro in the late 1980s was a sole practitioner making a mediocre living until Wayne Majors bailed him out.

A story in the January 19, 1990, Arizona Business Gazette noted that a "nonprofit corporation" called the Arizona Lawyers Association soon planned to start Arizona's first 24-hour legal hotline and lawyer referral service.

Described as an offshoot of the firm of Busby, Paternostro and Associates, the ALA planned to charge by the minute instead of the traditional hour, the story said. (Jerry Busby is a veteran Phoenix attorney. Paternostro is not licensed to practice law in this state.)

ALA director Wayne Majors told the publication that his group planned to spend up to $200,000 per month for advertising.

But the idea went south, or more accurately, to Texas, after State Bar of Arizona officials balked at it. The powers that be in Texas apparently had no such misgivings. The lax oversight of the referral "service" led to trouble for hundreds of Texas residents.

The Texas Lawyers Referral Service was supposed to pair clients with selected attorneys on a rotation basis. In truth, however, almost all potential Chapter 7 bankruptcy clients were given Charles Paternostro's telephone number, says assistant U.S. Trustee Alice Nystel, now working in San Bernardino, California.

The scam was devious: Wayne Majors' family owned the referral service, while Wayne Majors himself was the executive director, administrator and office manager for the Paternostro firm.

The combination of the phony referral service and an advertising campaign translated into big bucks for Paternostro and Associates.

It was into this heady environment that Larry Majors moved after he served his 1991 jail term for the Payson automobile-sales-tax scam.

Bankruptcy Court records in Texas indicate Larry Majors worked for a time at Paternostro and Associates. In April 1992, he and Paternostro attorney Marvin Davis moved to San Antonio and started the copycat firm of Davis and Associates.

As Paternostro had done in Dallas/Fort Worth, the Davis firm saturated San Antonio with advertising from the git-go. The Majorses also started the South Texas Lawyers Association Referral Service, which rapidly filtered hundreds of cases to the new firm.

Within months, Davis and Associates had grabbed about 10 percent of the area's bankruptcy market business. But success was fleeting. In early 1993, U.S. Bankruptcy Judge Leif Clark handed down the ruling that spelled the end for the fledgling Davis and Associates.

"Larry Majors fronted the money to set up this operation," the judge wrote, "negotiated a favorable lease, negotiated television commercial time, designed the advertising program and set up the firm's operations on the same model as that used in Paternostro and Associates. Davis provided the 'lawyer' Majors needed to start up his new 'law firm' operation."
Court records confirm who was in command at Davis and Associates. Larry Majors paid himself

$8,000 a month--far more than Davis or the firm's other attorneys earned--and was given the use of a Bentley.

As at Manning and Associates in Phoenix, Davis' bankruptcy clients paid their attorney's fees with postdated checks. And, as at Manning and Hessinger, the attorney's fees were "far more," according to Judge Clark, "than routinely was charged by most attorneys in the San Antonio area."

With bankruptcy officials starting to breathe down the Davis firm's collective neck, Larry Majors left abruptly in October 1992. Bankruptcy Court records indicate he took with him $300,000 in postdated checks for attorney's fees. He cashed $128,000 of that sum. But he has not been charged criminally by Texas authorities.

@rule:
@body:Everyone who knows the Majors brothers says they don't have any quit in them. Before they left Texas, probably in early 1993, Wayne and Larry Majors worked their zero-down scheme separately and together at five different law firms, leaving several legal careers in tatters.

The Texas State Bar last October 12 suspended Charles Paternostro for one year for neglecting his cases and for "misusing" retainers and other attorney's fees. Marvin Davis also has been suspended from practicing in Texas. And there are others.

A U.S. trustee based in Texas tells New Times that the Texas Supreme Court's Unauthorized Practice of Law Committee has contemplated suing Wayne Majors, but doesn't know where he is.

"They know he's not operating in Texas at the present time," the trustee says. "They're happy he's somewhere else."
That somewhere else is Phoenix.
As for Larry Majors, until a few weeks ago he was in San Diego, where he was executive director at the offices of Gordon and Associates, the area's highest-volume bankruptcy firm. Besides Majors, the Gordon firm includes--of all people--Duane Varbel.

Robert Gordon tells New Times he had been using the no-money-down concept for years before he hooked up last year with Majors and Varbel.

"I think zero-down serves a public purpose," says Gordon. "It can save a debtor who can't afford attorney's fees all at once from losing about-to-be-foreclosed or -repossessed property."
Only a few weeks ago, authorities let slip to Robert Gordon information about Larry Majors' past--Gordon insists he was ignorant of it. Gordon tells New Times he confronted Majors and then fired him.

The tip-off to Gordon had an unfortunate by-product. Judge Clark in San Antonio had slated a February 8 hearing to grill Larry Majors about still-unresolved matters--the postdated checks Majors took from Davis and Associates and other things.

But the United States marshal who went to Gordon and Associates with a subpoena for Larry Majors was unpleasantly surprised. Majors had left for parts unknown.

As for Duane Varbel, Gordon says skittishly that he's also ending his six-months-long business relationship with him.

"I am an honest guy and I run an honest shop," Gordon says. "Maybe I didn't know what I was dealing with here. I'm not sure what to think."
@rule:
@body:Business continues to skyrocket at the Valley's debtor mills. Manning and Associates recently hired two new attorneys, and Hessinger and Associates is doing just fine.

But there are disquieting rumblings. Norma Hammes, a San Jose lawyer and an officer in the National Association of Consumer Bankruptcy Attorneys, recently started her own investigation into the Majors brothers and their zero-down firms.

Hammes' conclusions are to the point:
ù She wants Bankruptcy Court judges to disallow the excessive fees charged by the zero-down firms and to declare as unenforceable the 18 percent installment contracts.

ù She wants Hessinger and Associates to tell its clients that its fees are uncollectible and also to order finance companies to cease collecting money.

ù She wants Texas prosecutors to determine whether the Majors brothers can be charged criminally there.

ù She wants State Bar of Arizona officials to initiate immediate investigations of both the Manning and Hessinger firms.

"Their way of doing things is a stain on our profession," says Hammes, "and it has to end."
That sounds right to Ruthie Dennis, who just wanted that financial "fresh start" and ended up a test case.

"People misuses you when they smell the money, even lawyers who should know better," Mrs. Dennis says. "I doubt if I'll ever get anything off of the TV again.